**Opinion issued September 26, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00281-CV

————————————

## IN THE INTEREST OF I.V.H., A CHILD

———

**On Appeal from the 328th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 17-DCV-245784**

———

## MEMORANDUM OPINION

The mother and father appeal the trial court's decree terminating their parental rights to their daughter, Iris. They contend that the evidence is insufficient to support (1) the predicate grounds for termination found by the trial court as well as its findings that (2) termination is in the child's best interest and (3) the Department made reasonable efforts to identify and evaluate relatives who could provide Iris

with a safe environment. The parents also contend that the trial court erred in striking Iris's paternal grandmother's motion in intervention. We affirm.

## BACKGROUND

The mother and father were both 21 years old at the time of trial. They had been removed from their birth families in childhood. The mother grew up in an adoptive home; the father was raised by a foster mother who later adopted him.

Iris is the father's first child and the mother's third. The mother quit high school in the ninth grade when she became pregnant with her first child. That child, who was four years old at the time of trial, lives with his maternal grandmother, who obtained custody of him shortly after Iris was born. The mother's second child, born two years later, tested positive for marijuana at birth. He does not live with the mother either; his paternal grandparents care for him.

### Circumstances leading to DFPS involvement

In August 2017, the maternal grandmother contacted the Department of Family and Protective Services (DFPS) with allegations that the parents were using crack cocaine. The mother, who was seven months' pregnant, was referred to Family-Based Safety Services (FBSS) after testing positive for marijuana. In FBSS, the parents agreed to participate in individual counseling and substance-abuse counseling. The caseworker arranged for them to participate in these services, but neither did so.

2

Iris was born in October 2017. Like the mother's second child, she tested positive for marijuana at birth. The mother admitted to smoking marijuana daily and to using marijuana during her second and third pregnancies. She also admitted to using MDMA while pregnant with Iris.

When Iris was born, the parents were living with the paternal grandmother in her three-bedroom home. Under the FBSS safety plan, the paternal grandmother was charged with supervising Iris when she was with her parents.

A childhood friend of the mother and his girlfriend also were living in the paternal grandmother's home at that time. The DFPS worker learned that police were surveilling the friend on the suspicion that he was dealing drugs out of the home. The police planned and executed a raid on the paternal grandmother's home about two weeks after Iris's birth, in early November 2017. In addition to the drugs found in the friend's possession, small amounts of marijuana and alprazolam were found in the parents' bedroom. The police arrested the parents, their friend, and his girlfriend on charges of drug possession. The father pleaded no contest to two charges of possession of a controlled substance and was sentenced to 17 days in jail.

In the aftermath of the raid, the DFPS took custody of Iris. The next day, the trial court approved emergency temporary managing conservatorship and the DFPS placed Iris in a foster home, where she has lived ever since.

**Family service plans**

The trial court incorporated the parents' family service plans into a December 2017 order. The family service plans required the parents to successfully complete parenting and anger-management classes, drug counseling, psychosocial-psychological evaluation, therapy, and drug testing. In addition, the parents were to have twice-weekly visits with Iris and demonstrate that they were able to maintain stable employment and a safe and stable home. The trial court also ordered the father to submit to paternity testing, which confirmed that he is Iris's father.

Pursuant to the family service plans, the parents appeared and submitted urine samples for random drug screens in December 2017 and January 2018. The results of both those screens were negative for illegal drugs. The parents failed to appear for drug screens scheduled in February and March 2018. They submitted to two hair-follicle drug tests during the proceeding, testing positive for marijuana and cocaine both times.

In April 2018, the trial court signed orders requiring the parents to submit hair-follicle and urine samples for drug screening, but they did not appear for testing. According to the guardian ad litem assigned to the case, the parents stopped responding to her texts and made no further contact with the ad litem.

The parents' psychological evaluations show that both have extensive histories of drug abuse. The mother started using drugs when she was 15, including

4

marijuana, synthetic marijuana, cocaine, methamphetamine, MDMA and alprazolam. The father admitted that he is a drug addict. Since the age of 13, he has had numerous stints in rehab and has spent time in juvenile detention. The psychologist who evaluated the father reported that the father admitted to having used marijuana, synthetic marijuana, LSD, MDMA, cocaine, Ambien, alprazolam, hydrocodone, and methamphetamine. The father also reported having been arrested nine times and had a pending theft charge. He admitted to having committed the theft and told the trial court that he was trying to get the charge reduced to a misdemeanor.

Both parents also have been treated for mental illness. The mother has been diagnosed with bipolar disorder and has received both inpatient and outpatient psychiatric care in the past. The evaluating psychologist diagnosed her with post-traumatic stress disorder (PTSD) and cannabis-abuse, cocaine-abuse, and alprazolam-abuse disorders. The psychologist referred the mother for a psychiatric evaluation, but she did not submit to one.

The father reported having previously been diagnosed with attention-deficit-hyperactivity disorder and PTSD. The father has received inpatient and outpatient psychiatric care for these conditions. He has been prescribed various psychotropic medications in the past but has not taken any prescribed medication for these conditions since before 2018.

The evaluating psychologist diagnosed the father with severe cannabis-abuse, sedative-abuse, and severe other substance-abuse disorders, and PTSD. The psychologist cautioned that if the father did not complete an intensive treatment plan and therapy to address his PTSD-induced depression and anxiety, he was unlikely to stay off drugs.

The parents have spotty employment histories. The mother works as a dancer in a men's club. She testified that she had worked only two shifts in the month before trial, for which she earned a total of $48. She was fired from another club after a dancer there accused her of possessing illegal drugs. The father has worked at numerous restaurants in various capacities, including dishwasher, busboy, and server. He held and lost several jobs during the pendency of the case.

The parents participated in outpatient drug counseling as ordered in their family service plans, but they did not successfully complete it. After they missed several appointments, the counselor discharged them. With the caseworker's intervention, the therapist resumed their counseling. They nevertheless continued to miss appointments, and the therapist discharged them again. At trial, the father admitted that he had not done the work during the case to deal with his substance-abuse issues.

**Parents' interactions with Iris**

The parents missed approximately 40% of the twice-weekly scheduled visits with Iris. They made various excuses for their failure to attend counseling, classes, and visitation, including car trouble, lack of transportation, and illness. The guardian ad litem observed the parents' interactions with Iris during a few visits and found them appropriate. She noted, however, that the parents missed a significant number of visits and would ask to cut the visit short if Iris was crying or sick. The guardian ad litem initially supported reunification with the parents, but changed her opinion in April 2018, after the parents "flat-out refused" to submit to court-ordered hair-follicle testing and stopped responding to her efforts to communicate with them. The guardian ad litem noted that the parents did not seem to make their visits with Iris a priority and opined that that the parents cannot provide the consistency, love, and support that Iris needs.

At trial, both parents testified that they did not believe Iris should be placed with them at that time, but they still wanted to be able to see her and to be a part of her life. They could not say when they would be ready to take custody of Iris, conceding that they needed to become more mature.

**Foster parent's interactions with Iris**

Both the caseworker and the guardian ad litem recommended that Iris remain with her foster parent. The foster mother testified that she loves Iris and would like

to adopt her. Iris is bonded to her foster mother, who is a teacher and has a strong extended family-support network. The foster mother noted that Iris currently enjoys music and dancing, playing with balls, and reading. As Iris gets older, the foster mother would like to have Iris try various activities, and she would support Iris in whatever she might want to pursue. She and Iris do a lot of things together, such as reading, playing outside, and spending time with extended family. She was looking forward to her summer break from teaching to spend the time with Iris.

The foster mother's parents live nearby, and she has two sisters in the area. Her sisters are married and have their own children. The extended family regularly spends time together. The foster mother has lived in the same home for more than 10 years.

**Trial proceedings**

The paternal and maternal grandmothers petitioned to intervene in the suit, one shortly before trial and the other mid-trial. Each represented that she was willing to take custody of Iris. On the DFPS's motions, the trial court struck both petitions.

The trial court heard the case over five days in early 2019: February 18th, February 20th, February 22th, April 2nd, and April 3rd. Following trial, the trial court terminated the parental rights under subsections 161.001(b)(1)(D), (E), (I), (O), and (P), and found that termination is in Iris's best interest pursuant to section 161.001(b)(2).

8

**DISCUSSION**

## I. Evidence Supporting Termination of Parental Rights

The parents contend that the evidence is factually insufficient to support the trial court's decree terminating their parental rights under subsections 161.001(b)(1)(D) and (E), and further challenge the legal and factual sufficiency of the evidence supporting its findings under subsections 161.001(b)(1)(I), (O), and (P).

### A. Evidentiary-sufficiency standards of review

We strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). However, "'the rights of natural parents are not absolute'" and "'[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities.'" *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). A trial court may order termination of the parent-child relationship if DFPS proves, by clear and convincing evidence, one of the statutorily enumerated predicate findings for termination and that termination of parental rights is in the best interest of the children. TEX. FAM. CODE § 161.001(b); *see In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (stating that federal due process clause and Texas Family Code both mandate "'heightened'" standard of review of clear and convincing evidence in parental-rights-termination cases). DFPS must prove both elements—a statutorily prescribed

predicate finding and that termination is in the children's best interest—by clear and convincing evidence. *In re E.N.C.*, 384 S.W.3d at 803; *In re A.V.*, 113 S.W.3d at 362; *but see also In re N.G.,* 577 S.W.3d 230, 235 (Tex. 2019) (per curiam) (holding that reviewing court must review (D) or (E) findings if raised on appeal because of potential consequences for parental rights to a different child). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 & n.18 (Tex. 2002).

In a legal-sufficiency review in a parental-rights-termination case, the appellate court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If, after conducting a legal-sufficiency review of the record, we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient. *Id.* In conducting a factual-sufficiency review in a termination appeal, we must determine

whether, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). "'If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.'" *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (quoting *In re J.F.C.*, 96 S.W.3d at 266)).

### B. Evidence of grounds supporting termination

"To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding— even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d at 232. Predicate findings under subsections 161.001(D) or (E), however, may have significant collateral consequences. *Id.* at 234, 235 (discussing TEX. FAM. CODE § 161.001(b)(1)(M), which provides that court may terminate parent's rights if it finds, by clear and convincing evidence, that parent has had his "parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state"). Because of the consequences attached to an endangerment finding under section 161.001(b)(1)(D) or (E), when a

11

parent raises a challenge to a finding that he or she endangered a child in violation of section 161.001(D) or (E), due process and due course of law require the appellate court to review those findings even when another predicate act is supported by sufficient evidence or unchallenged. *Id* at 236–37. The Supreme Court has previously held that a court of appeals must detail the relevant evidence when reversing a termination decree for insufficient evidence, but it was not required to provide the detailed analysis when it affirmed a termination after determining that the evidence is sufficient. *See id.* at 237 (citing *In re A.B.*, 437 S.W.3d 498, 504–05 (Tex. 2014)). But the same due process and due course of law concerns that require a court of appeals to review a challenge to a (D) or (E) finding also require the court to provide a detailed analysis of the relevant evidence relied upon to conclude whether the evidence is sufficient. *See id.*

We therefore focus on whether factually sufficient evidence supports the trial court's endangerment findings.

### 1. Endangering conduct under subsections 161.001(b)(1)(D) and (E).

Family Code section 161.001(1)(D) provides that a court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well being of the child." Section 161.001(1)(E) provides that a court may order

12

termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well being of the child."

As used in section 161.001, "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). In this context, endanger means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *Id.*; *see In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (endangerment includes jeopardizing a child's emotional or physical health).

Endangerment under subsection (D) arises from a child's environment and a parent's disregard for the potential for danger created by the environment. *Jordan*, 325 S.W.3d at 721. Although "the focus of subsection (D) is on the child's living environment and not on the parent's conduct, parental conduct may produce an endangering environment." *In re M.T.W.*, No. 01-11-00162-CV, 2011 WL 6938542, at *12 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.) (citing *Jordan*, 325 S.W.3d at 721). For example, illegal drug use by a parent or other resident of the child's home may produce an endangering environment. *Id.*

13

Endangerment under subsection (E) arises when a parent's course of conduct jeopardizes the child's emotional or physical health. *See In re A.J.H.*, No. 01-18-00245-CV, 2019 WL 190050, at *7 (Tex. App.—Houston [1st Dist.] Jan. 15, 2019, no pet.) (mem. op.) (quoting *Jordan*, 325 S.W.3d at 723). This course of conduct includes acts, omissions, and failures to act, but it "must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent." *In re M.T.W.*, 2011 WL 6938542, at *12 (citing *Jordan*, 325 S.W.3d at 723). Because the evidence concerning these two statutory grounds for termination is often interrelated, we may consolidate our examination of the evidence to support both grounds. *See In re A.J.H.*, 2019 WL 190050, at *8.

DFPS need not establish that a parent intended to endanger a child to support termination under Subsection (E). *See In re M.C.*, 917 S.W.2d at 270. Nor is it necessary to establish that the parent's conduct was directed at the child or caused actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being. *See Boyd*, 727 S.W.2d at 533; *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Danger to a child's well-being may be inferred from parental misconduct. *Boyd*, 727 S.W.2d at 533; *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). "'As a general rule, conduct that subjects a child to a life of

14

uncertainty and instability endangers the physical and emotional well-being of a child.'" *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Conduct may be endangering even when it does not occur in the child's presence. *In re A.D.M.*, No. 01-16-00550-CV, 2016 WL 7368075, at *6 (Tex. App.—Houston [1st Dist.] Dec. 20, 2016, pet. denied) (mem. op.) (quoting *Walker*, 312 S.W.3d at 617). A parent's past endangering conduct may support an inference that past conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *See id.*

The record shows that the parents have not been able to create a safe and stable home for Iris. They brought newborn Iris to a home that was under police surveillance for drug trafficking. Despite claiming ignorance of the drug-related activity in the home, they, too were arrested and pleaded no contest to possession charges arising from the marijuana and alprazolam found in their bedroom. "[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Illegal drug use may support termination under section 161.001(b)(1)(E) "[b]ecause it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617; *see In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). This creates a risk of uncertainty and instability, and "[a]s a general rule, conduct that subjects a child to a life of

15

uncertainty and instability endangers the physical and emotional well-being of a child." *N.A.B. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-14-00377-CV, 2014 WL 6845179, at *2 (Tex. App.— Austin Nov. 26, 2014, no pet.) (mem. op.). Two of the mother's children—including Iris—tested positive for marijuana at birth, and both parents admitted to long histories of drug abuse, tested positive for illegal drugs and refused to submit to testing while the case was pending, and failed to successfully complete the outpatient drug-rehabilitation services offered by DFPS.

The parents argue that no evidence shows that Iris suffered any actual harm from the mother's use of marijuana while pregnant or that Iris was actually in danger during the 17 days before the paternal grandmother's house was raided. But our analysis is not so confined: courts may look to evidence of parental conduct both before and after a child's birth and before and after a child's removal from the home to determine whether termination is appropriate. *See In re J.O.A.*, 283 S.W.3d at 345 (citing *In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied)); *Walker*, 312 S.W.3d at 617 (explaining that relevant conduct may occur either before or after child's removal from home).

Further, the fact that Iris appears to have suffered no actual harm from the *in utero* marijuana exposure, while fortuitous, does not preclude a finding of endangerment. While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually

16

suffer injury. Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d at 738–39. A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.—Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014).

In light of the entire record, we conclude the disputed evidence the trial court could reasonably have credited in favor of its endangerment finding is not so significant that the court could not reasonably have formed a firm belief or conviction that the parents engaged in conduct endangering Iris's well-being. *See In re J.O.A.*, 283 S.W.3d at 345. Accordingly, the evidence is factually sufficient to support the trial court's findings under subsections (D) and (E).

Because these grounds are dispositive, we need not consider the parents' evidentiary-sufficiency challenges to the remaining predicate grounds for termination found by the trial court.

C. **Evidence that termination of parental rights is in the child's best interest**

The parents argue that the evidence is factually insufficient to support the trial court's finding that termination is in Iris's best interest. As a matter of public policy, "'the best interest of a child is usually served by maintaining the parent-child relationship.'" *In re J.F.C.*, 96 S.W.3d at 294. Despite this important relationship,

17

the Texas Supreme Court has held that "'protection of the child is paramount'" and "'the rights of parenthood are accorded only to those fit to accept the accompanying responsibilities.'" *In re A.V.*, 113 S.W.3d at 361.

Appellate courts examine the entire record to decide what is in the best interest of the child. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). There is a strong presumption that the best interest of a child is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In assessing whether termination is in a child's best interest, the courts are guided by the non-exclusive list of factors set forth in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Id.* "'[T]he State need not prove all of the factors as a condition precedent to parental termination, 'particularly if the evidence was undisputed that the parental relationship endangered the safety of the child.'" *In re C.T.E.*, 95 S.W.3d 462, 466

(Tex. App.—Houston [1st Dist.] 2002, pet. denied) (quoting *In re C.H.*, 89 S.W.3d at 27).

For purposes of determining legal sufficiency, we consider those factors that support the finding that termination was in the child's best interest. *Yonko v. Dep't of Fam. & Protective Servs.*, 196 S.W.3d 236, 243 (Tex. App.—Houston [1st Dist.] 2006, no pet.). If the evidence is legally sufficient, we then balance the factors presented in the legal-sufficiency argument against the evidence that undercuts any finding that termination is justified under the statute. *In re C.T.E.*, 95 S.W.3d at 467. We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. If, after considering the entire record, the disputed evidence that weighs against termination is so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination was justified, then the evidence is factually insufficient to support termination. *Id.* A court of appeals should detail in its opinion why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of termination. *Id.* at 266–67.

The evidence of the parents' chronic drug abuse is legally and factually sufficient to support the trial court's finding that termination of their parental rights was in the child's best interest. Despite the family service plan's prohibition, the parents continued to use illegal drugs while this case was pending. *See In re A.C.*,

394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Evidence of a parent's past pattern of drug use is relevant to present and future stability, especially regarding the parent's ability to provide for the children and protect them from emotional and physical danger. *In re A.C.*, 394 S.W.3d at 642. "[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re A.M.*, 495 S.W.3d at 580; *see also In re S.G.*, No. 01-18-00728-CV, 2019 WL 1448870, at *5 (Tex. App.—Houston [1st Dist.] Apr. 2, 2019, pet. denied) (mem. op.) ("Parental drug abuse also reflects poor judgment and an unwillingness to prioritize a child's safety and welfare and thus may be considered in determining a child's best interest.").

The evidence shows that Iris is getting all of her needs met in her current placement and that the foster parent wants to adopt her. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (stating that when children are too young to express their desires, factfinder may consider that children have bonded with foster family, are well-cared for by it, and have spent minimal time with parent). Iris interacts well with the foster mother's extended family, who are all involved in Iris's life. The guardian ad litem observed Iris in the foster mother's care

and told the court that Iris is a happy and calm baby and has no special needs. She recommended that Iris remain with the foster mother. *See In re C.H.*, 89 S.W.3d at 28 ("'Evidence about placement plans and adoption are, of course, relevant to best interest.'").

The trial court reasonably could have considered that the parents' drug abuse would continue in the future. *See Walker*, 312 S.W.3d at 617 (stating that "'danger to a child need not be established as an independent proposition and may be inferred from parental misconduct even if the conduct is not directed at the child and the child suffers no actual injury'").

The parents admitted at trial that it would not be in Iris's best interest to be immediately returned to their care, and they were unable to identify when their current circumstances would change for the better. On this record, factually sufficient evidence supports the trial court's finding that termination is in Iris's best interest.

## II. Challenges Concerning the Child's Placement

The parents contend that the trial court erred in striking the grandmothers' petitions in intervention and that the evidence is factually insufficient to show that the DFPS made reasonable efforts to identify and evaluate potential kinship placements for Iris. *See* TEX. FAM. CODE § 263.306(a)(5), (6). Because the parents were not parties to the petitions in intervention, they lack standing to challenge the

21

rulings on appeal, but the gist of their challenge is subsumed in their contention that the trial court should have placed Iris with one of the grandmothers instead of leaving her in foster care.

The parents claim that the maternal grandmother "was always open to taking [Iris] if she could not be returned to the parents." But the trial court could properly rely on testimony from the caseworker and the guardian ad litem refuting that claim. The caseworker testified that she contacted the maternal grandmother early in the case to ask if she was willing to take Iris. The maternal grandmother, who already had custody of the mother's four-year-old, declined, telling the caseworker that she had health problems that made her unable to care for a baby. At trial, the maternal grandmother denied telling the caseworker that she did not want the child placed in her home or that she was physically incapable of caring for the child. She conceded, however, that she would not allow the Department to come into her home.

The guardian ad litem also visited the maternal grandmother in February 2018, at the beginning of the case. At that time, the maternal grandmother told the ad litem that she was not capable of raising another child due to her health problems. The maternal grandmother also denied telling the guardian ad litem that she did not want Iris placed in her home or that she was not physically capable of caring for the child.

The mother has a history of conflict with the maternal grandmother and concerns over the adequacy of her care of the mother's oldest son. Although the mother later recanted, she alleged that the maternal grandmother was addicted to pain medication. The guardian ad litem concluded that placement in the maternal grandmother's home would not be in Iris's best interest. The record shows that DFPS made reasonable efforts to identify and evaluate the maternal grandmother's home as a potential kinship placement for Iris.

DFPS did not consider the paternal grandmother's home suitable because the police conducted a drug raid on the home and the Department was not going to place Iris back in that environment. The guardian ad litem, who visited the home, noted that it "is not that large," but that the paternal grandmother stated that she "wasn't aware that drugs were being sold out of her home." The parents told the ad litem they were able to smoke marijuana in their bedroom at the paternal grandmother's home because she couldn't smell the smoke. Several months after the drug raid, a robbery occurred at the home. The parents indicated that they know who committed the robbery, but that the person would rob again if they turned him in. According to the ad litem, these circumstances pose[d] a real concern . . . for [the] safety of returning [Iris] to this setting." The paternal grandmother also had health problems for which she was hospitalized shortly before trial. The record shows that DFPS made reasonable efforts in considering whether the paternal grandmother's home

would be an appropriate placement for Iris. Although the parents may have preferred a different outcome, DFPS did not fail to reasonably investigate and consider these possible placements for Iris.

## CONCLUSION

We affirm the decree of the trial court.


Gordon Goodman
Justice

Panel consists of Justices Lloyd, Goodman, and Landau.